STATE OF NEBRASKA, APPELLEE, V. RONALD EARL TILLMAN, ALSO
KNOWN AS STAR CHILD, ALSO KNOWN AS DONALD TILM,
APPELLANT.

511 N.W.2d 128

Filed March 23, 1993.   No. A-91-1153.

Dennis R. Keefe, Lancaster County Public Defender, and Robert G. Hays for appellant.

Don Stenberg, Attorney General, and Donald A. Kohtz for appellee.

SIEVERS, Chief Judge, and CONNOLLY and WRIGHT, Judges.

CONNOLLY, Judge.

## I. INTRODUCTION

This appeal arises from the appellant's multiple convictions for second degree assault on an officer and use of a deadly weapon to commit a felony, pursuant to Neb. Rev. Stat. §§ 28-930 and 28-1205 (Reissue 1989), and a single conviction for

terroristic threats, pursuant to Neb. Rev. Stat. § 28-311.01 (Reissue 1989). The appellant argues (1) that his constitutional due process rights were violated by jury instructions that reduced the State's burden of proof on two charges, (2) that there was insufficient evidence to support the conviction for terroristic threats, and (3) that the collective sentence imposed was excessive. We affirm.

## II. FACTS

### 1. THE INCIDENT

At approximately 4:40 a.m. on December 25, 1990, uniformed officers Todd Beam and Todd Hruza of the Lincoln Police Department responded to a dispatch to contact a burglary suspect, Jorge Farr, at 2218 Q Street in Lincoln. There were numerous people in the house and on the front porch when the officers arrived at 2218 Q Street. The officers persuaded a man on the porch to go into the house and ask Farr to come outside.

Moments later, Beth Farr, Jorge Farr's aunt, stormed out onto the porch and confronted the officers. Beth Farr's son, Kenny Farr, followed immediately behind her. Beth and Kenny Farr initiated a scuffle with the officers and were placed under arrest. The scuffle erupted into a brawl, with people pouring out of the house and assailing the officers as they struggled with Beth and Kenny Farr. As the fracas intensified, Beth Farr, Kenny Farr, and the two officers tumbled over the porch railing and onto the ground.

### (a) Hruza is Shot

While trying to subdue Kenny Farr with a lateral vascular neck restraint, Hruza experienced a painful blow to his back and upper right arm. The appellant, Ronald Earl Tillman, had hit Hruza across the back and upper right arm with a 2-by-2 board approximately 3 feet long. While trying to disengage himself from Kenny Farr so that he could deal with Tillman, Hruza felt a tug on his right hip where his duty weapon, a 9-mm Smith and Wesson semiautomatic pistol, was located. Hruza turned away from Kenny Farr and saw Tillman holding his gun.

Hruza testified that Tillman pointed the gun at him and said,

" 'Now you are going to get yours,' " and, " 'If you want some of this, I'll give it to you.' " Hruza scrambled on his hands and knees toward nearby vehicles for cover. As he scrambled, he heard gunshots and felt painful tugging and stinging sensations in his legs and arms. Hruza later discovered that he had been shot multiple times and was wounded in both thighs, both forearms, and his right wrist and hand.

### (b) Confrontation with Beam

Beam was still on the ground struggling with Beth Farr when he heard the shots. Beam turned to see where the shots had come from and saw Tillman, approximately 3 to 4 feet away, aiming a loaded gun at Beam's chest. Tillman shifted his aim to Beam's head and repeatedly said to Beam, " 'Let her go.' " Tillman continued to aim the gun at Beam as Tillman slowly backed away. Beam attempted to get up, but Tillman either leaned forward or took a quick half step back toward him, so Beam froze. Tillman resumed backing away and began turning as he jogged across the backyard of 2218 Q Street. Beam got up, drew his gun, and took cover by the side of the house. Tillman raised the gun and fired a shot into the air while, according to Beam, wearing a smile or a laughing expression. Tillman then continued jogging away across the backyard of 2218 Q Street and began running as he left the premises.

Not knowing the fate of Hruza, Beam pursued Tillman only a short way, then returned to his cruiser. He found Hruza, summoned medical assistance for him, put out a description of Tillman, and requested that the perimeter around 2218 Q Street be secured to contain Tillman. Hruza was rushed to the hospital, where he received emergency treatment for his wounds.

### 2. Procedural History

Tillman was apprehended. For shooting Hruza, Tillman was charged with attempted second degree murder (count I) and use of a weapon to commit a felony (count II) as well as second degree assault on an officer (count III) and another corresponding charge of use of a weapon to commit a felony (count IV). For striking Hruza with the 3-foot 2-by-2 stick, Tillman was charged with second degree assault on an officer

(count V) and use of a weapon to commit a felony (count VI). For pointing the gun at Beam, Tillman was charged with terroristic threats (count VII) and use of a weapon to commit a felony (count VIII).

At trial, the State adduced substantial physical and testimonial evidence against Tillman, including the testimony of Hruza and Beam. After the State rested, Tillman made a motion to dismiss, which was denied. Tillman rested without adducing any evidence, then moved for a directed verdict, which motion also was denied. A jury instruction conference was held. Tillman's objections to certain jury instructions will be addressed in detail later in this opinion.

Tillman was acquitted on counts I and II and found guilty on the remaining counts. His motion for new trial was overruled. Tillman was sentenced to prison for $6\frac{1}{2}$ to 20 years on each of counts III, IV, and VIII; 4 to 10 years on count V; 3 to 6 years on count VI; and 20 months to 5 years on count VII. The sentencing court ordered all sentences to be served consecutively.

### III. ASSIGNMENTS OF ERROR

The assignments of error numbered VII through X in Tillman's brief were not discussed in the body of the brief, so we do not consider them. See, *State v. Melton*, 239 Neb. 576, 477 N.W.2d 154 (1991); Neb. Ct. R. of Prac. 9D(1)d (rev. 1992). The remaining assignments of error we condense into the following: (1) The trial court erred when it overruled Tillman's objections to jury instructions Nos. 4(e) and 4(f) and rejected the instructions proffered by Tillman to replace Nos. 4(e) and 4(f); (2) there was insufficient evidence to support the verdict of guilty on the charge of terroristic threats; and (3) the collective sentence was excessive.

### IV. STANDARD OF REVIEW

Prejudicial error regarding jury instructions may not be predicated solely upon a particular sentence or phrase in an isolated instruction, but must appear from consideration of the entire instruction of which the sentence or phrase is a part, as well as consideration of other relevant instructions given to the jury. All the instructions must be read together, and if the

instructions taken as a whole correctly state the law, are not misleading, and adequately cover the issues, there is no prejudicial error. *State v. Copple*, 224 Neb. 672, 401 N.W.2d 141 (1987).

When reviewing the sufficiency of the evidence to support a conviction in a criminal prosecution, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or reweigh the evidence. These are all matters for the trier of fact, and a conviction must be sustained if the evidence, when viewed in the light most favorable to the State, is sufficient to support the conviction. *State v. Waltrip*, 240 Neb. 888, 484 N.W.2d 831 (1992).

An appellate court may reduce a sentence when, in its opinion, the sentence is excessive. Neb. Rev. Stat. § 29-2308 (Cum. Supp. 1992); *State v. Spiegel*, 239 Neb. 233, 474 N.W.2d 873 (1991).

A sentence imposed within the statutory limits will not be disturbed on appeal in the absence of an abuse of discretion by the trial court. *State v. Miller*, 240 Neb. 297, 481 N.W.2d 580 (1992).

Judicial abuse of discretion means that the reasons or rulings of the trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. *State v. Thomas*, 238 Neb. 4, 468 N.W.2d 607 (1991).

## V. ANALYSIS

### 1. "To Wit"

Jury instruction No. 4(e), the court's instruction on second degree assault on Hruza with a stick, stated in pertinent part:

The material elements which the State must prove by evidence beyond a reasonable doubt in order to convict the defendant of the crime of second degree assault on an officer in Count V of the Information are:

1. that the defendant . . . caused bodily injury to [Hruza];

2. that the defendant did so intentionally or knowingly;

3. that the defendant did so with a dangerous

instrument, to wit: a stick . . . .

Tillman objected to the instruction on grounds that the use of the phrase "to wit: a stick" created a conclusive presumption that a stick is a dangerous instrument. Use of a dangerous instrument was one of the elements of the crime with which Tillman was charged in count V. See § 28-930(1)(a). Thus, whether the stick was a dangerous instrument was a factual question for the jury that had to be proven beyond a reasonable doubt. Tillman argues on appeal that the instruction violated his due process rights under the federal and Nebraska Constitutions because the presumption created by the instruction relieved the State of its constitutional burden to prove beyond a reasonable doubt that the stick was a dangerous instrument.

To avoid misleading the jury and reducing the State's burden of proof, Tillman proffered the following instruction as a replacement for No. 4(e):

The material elements which the State must prove by evidence beyond a reasonable doubt in order to convict the defendant of the crime of second degree assault on an officer are:

1. That the defendant . . . caused bodily injury to [Hruza];

2. That the defendant did so intentionally or knowingly;

3. That the defendant did so by using a stick;

4. That the stick used by the defendant was a dangerous instrument . . . .

Tillman's proposed instruction was rejected. The court explained that it was not settling a fact question for the jury by using the phrase "to wit," but was merely distinguishing the gun, the instrumentality in the other charges, from the stick.

Tillman also objected to jury instruction No. 4(f), which stated in pertinent part:

The material elements which the State must prove by evidence beyond a reasonable doubt in order to convict the defendant of the crime of use of a deadly weapon to commit a felony in Count VI of the Information are:

1. that the defendant . . . committed the felony of

second degree assault on an officer, which is the subject of Count V of the Information, as set forth in the immediately preceding Instruction Number 4(e);

2. that the defendant used a deadly weapon, to wit, a stick, to commit the felony of second degree assault on an officer . . . .

As an alternative to No. 4(f), Tillman proffered the following instruction:

The material elements which the State must prove by evidence beyond a reasonable doubt in order to convict the defendant of the crime of use of a weapon to commit a felony are:

1. That the defendant . . . committed the felony of second degree assault on an officer, which is the subject of Count V of the Information, as set forth in Instruction [No. 4(e)];

2. That the defendant used a stick, to commit the assault on an officer;

3. That the stick used by the defendant was a deadly weapon . . . .

Again, Tillman was concerned that the court's proposed instruction would create a presumption relieving the State of the burden of proving one of the elements of the crime, in this case that the stick was a deadly weapon. Despite acknowledgment by one of the State's attorneys that the court's instruction might create the presumption complained of by Tillman, the court rejected Tillman's proposed instruction in favor of its own.

Tillman cites *State v. Henderson*, 356 Mo. 1072, 204 S.W.2d 774 (1947), in which the Missouri Supreme Court determined that "to wit" was merely a device signaling that the words following "to wit" were intended to clarify the words preceding "to wit." Nine years later, the same court reversed its interpretation of "to wit," finding that the phrase suggested exactly the kind of presumption complained of by Tillman. See *Glowacki v. Holste*, 295 S.W.2d 135 (1956). Meanwhile, the State found it necessary to reach back over a century for a case favorable to its interpretation of "to wit." See *Commonwealth v. Quinlan*, 153 Mass. 483, 27 N.E. 8 (1891) ("to wit" means to

call attention to a more particular specification of what has preceded).

In this case, use of the phrase "to wit" in the jury instructions raised semantic problems that can be confusing for lawyers and judges, not to mention jurors. Although the trial court retains discretion in the wording of jury instructions, *State v. Ring*, 233 Neb. 720, 447 N.W.2d 908 (1989), in this case the trial court's insistence on using the instructions containing the phrase "to wit," rather than adopting Tillman's alternative instructions, could have been prejudicial error. Taken by themselves, instructions Nos. 4(e) and 4(f) could have misled a jury into thinking that the court already had settled the questions of whether the stick used by Tillman was a dangerous instrument for purposes of count V and a deadly weapon for purposes of count VI. We do not find prejudicial error in this case because the instructions taken as a whole are not misleading and do not reduce the State's burden of proof, since the real issue for the jury is determining the manner of usage. For example, a pillow, used normally, is obviously not a dangerous instrument, but if used to smother someone, it very well might be a dangerous instrument.

Instruction No. 8 contains the following definitions of terms used throughout the instructions:

"Dangerous instrument" means any object which, because of its use, is capable of inflicting bodily injury.

"Deadly weapon" means any instrument which, in the manner it is used or intended to be used, is capable of producing a bodily injury involving a substantial risk of (1) death; (2) serious permanent disfigurement; or (3) protracted loss or impairment of the function of any organ or body part. The weapon need not actually produce such injuries, but need only be used in a manner which makes it capable of producing them.

For purposes of count V, the State was held to its burden of proving that the stick was a dangerous instrument because, when we consider instructions Nos. 4(e) and 8 together, the instructions as a whole directed the jury to decide whether Tillman had used the stick in a manner capable of inflicting bodily injury. Similarly, for purposes of count VI, Tillman's due

process rights were safeguarded because instructions Nos. 4(f) and 8 taken together required the State to prove that Tillman had used the stick in a manner capable of producing death, serious permanent disfigurement, or protracted loss or impairment of the function of any organ or body part. Therefore, we find no prejudicial error in the trial court's jury instructions.

## 2. TERRORISTIC THREATS

Section 28-311.01 provides in relevant part: "(1) A person commits terroristic threats if he or she threatens to commit any crime of violence: (a) With the intent to terrorize another . . . or (c) In reckless disregard of the risk of causing such terror . . . ."

Tillman argues that he cannot be charged and convicted under § 28-311.01 because he never actually threatened Beam:

> There is evidence in this case that the defendant pointed a gun at Officer Beam, but there is no evidence that the defendant articulated a threat to commit a crime of violence. . . . Certainly it was wrong for the defendant to point a gun at the officer, but without the articulation of a threat to commit a crime of violence, he has not committed the offense of terroristic threats.

Brief for appellant at 21.

The implication in Tillman's argument is that a defendant can be prosecuted under § 28-311.01 only for a threat that is articulated verbally. Tillman cites *State v. Willett*, 233 Neb. 243, 444 N.W.2d 672 (1989), and *State v. Saltzman*, 235 Neb. 964, 458 N.W.2d 239 (1990), to support the proposition that terroristic threats must be articulated verbally, but his reliance on those two cases is misplaced. Neither of those cases states that terroristic threats can only be verbal. Furthermore, *Willett* and *Saltzman* both involved threats made in the course of telephone conversations. The case before us is distinguishable in that it involved a face-to-face confrontation, a situation in which a threat can be conveyed in many ways other than verbal articulation.

Section 28-311.01 does not require that a threat be verbal, and the Nebraska Supreme Court has not defined "threat" in terms of verbal communication. See *State v. Methe*, 228 Neb.

468, 422 N.W.2d 803 (1988) (to "threaten" is to promise punishment, reprisal, or other distress). See, also, *State v. Kipf*, 234 Neb. 227, 450 N.W.2d 397 (1990) (a "threat" is a declaration of one's purpose to work injury to the person, property, or rights of another).

The terroristic threats statute in the State of Kansas, Kan. Stat. Ann. § 21-3419 (1988), is virtually identical to § 28-311.01 in Nebraska. According to the Kansas Court of Appeals in *State v. Miller*, 6 Kan. App. 2d 432, 629 P.2d 748 (1981), the definition of "threat" as used in § 21-3419 (1981) was adopted from Kan. Stat. Ann. § 21-3110(24) (Supp. 1978). In 1979, the Kansas Supreme Court had rejected the argument that a "threat" as defined in § 21-3110(24), which definition is still in effect, was restricted to verbal communication. See *State v. Howell & Taylor*, 226 Kan. 511, 601 P.2d 1141 (1979) (firing of a gun constituted a threat under § 21-3110(24)). Therefore, citing *State v. Howell & Taylor* as controlling precedent, the Kansas Court of Appeals in *State v. Miller* held that a threat under § 21-3419 (1981) was not limited to written or oral communication; a threat also could be inferred from a physical act.

We are persuaded by the logic of the Kansas courts. Mindful of the time-honored adage that actions speak louder than words, we hold that under § 28-311.01, a threat can be conveyed not only through written or oral communication, but also through a physical act.

We now quickly review the confrontation between Tillman and Beam. Beam was trying to subdue Beth Farr. Tillman aimed the gun at Beam's face and repeatedly ordered the officer to release Farr. Beam could see that the gun was loaded. It is true that the only words spoken to Beam by Tillman were, "Let her go," which by themselves do not constitute a threat. However, those words in combination with the physical act of pointing a gun could reasonably constitute a terroristic threat. Indeed, the pointing of a gun by itself might constitute a terroristic threat. Certainly, when a juror hears evidence that the defendant stood several feet from the victim saying, "Let her go," while aiming a loaded gun at the victim's face, it is reasonable for the juror to infer beyond a reasonable doubt that

the defendant's intended message was, "Let her go, or I will shoot you in the face." When viewed in the light most favorable to the State, the evidence is sufficient to support the jury's determination that Tillman threatened to commit a crime of violence against Beam with the intent of terrorizing him into releasing Farr.

### 3. EXCESSIVE SENTENCE

Tillman was convicted of five Class III felonies and one Class IV felony. The sentences for each offense are set out above in section II, "Facts." All the sentences are within the range permitted by statute. The sentencing court ordered that all sentences imposed be served consecutively, but the effect of the consecutive sentences was significantly tempered by their indeterminateness. See *State v. Haynie*, 239 Neb. 478, 476 N.W.2d 905 (1991) (it is the minimum portion of an indeterminate sentence which measures its severity). Tillman could have been sentenced to a total of 105 years in prison. Instead, he received a minimum of 28 years and 2 months, and a maximum of 81 years.

In the presentence investigation report, Tillman described himself as a man with " 'a serious problem. I wake up every morning wanting to kill somebody . . . .' " Tillman is a human time bomb, prone to " 'spells' " and " 'seizures,' " liable to go off at any time for any reason, or for no reason at all. The court determined that imprisonment was necessary for protection of the public and that a lesser sentence would have depreciated the seriousness of the crimes and promoted disrespect for the law. Given Tillman's criminal record in Nebraska and some of his remarks while in custody—" 'I'm glad I shot the son-of-a-bitch. I should have killed both the motherfuckers. I hate cops.' "—the reasoning behind the sentencing of Tillman was not clearly untenable.

We find no abuse of discretion, and nothing excessive, in the sentencing of Tillman.

AFFIRMED.